# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF ALABAMA
# NORTHERN DIVISION

**KIMBERLY BELCHER,** *et al.*                                                      **PLAINTIFFS**

v.                                             **CIVIL ACTION NO. 2:15-CV-834-KS-WC**

**THE GRAND RESERVE MGM, LLC,** *et al.*                              **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After holding a bench trial, receiving the parties' briefs, and carefully considering the parties' evidence and arguments, the Court finds as follows: 1) Plaintiffs presented no credible evidence of racial discrimination, 2) Plaintiffs' claims of familial discrimination fail because Defendants were responding to legitimate safety concerns, 3) Defendants did not retaliate against Plaintiffs, and 4) Defendants did not substantially interfere with Plaintiffs' use or enjoyment of the subject property. The Court will enter a separate judgment in favor of Defendants.

## I. BACKGROUND

This case involves claims under the Fair Housing Act ("FHA"),[1] the Alabama Fair Housing Law ("ALFHL"),[2] and Alabama common law. Defendants own and lease apartments at the Grand Reserve Pike Road apartment complex in Pike Road, Alabama. Plaintiffs are an African-American family and lived in the Grand Reserve for a period of time. Plaintiffs claim that Defendants created and enforced several rules

---

[1] 42 U.S.C. § 3601, *et seq.*

[2] ALA. CODE §§ 24-8-1, *et seq.*

that were designed to discriminate against African-American residents and residents with children. Plaintiffs also claim that Defendants retaliated against them with harassment, threats, and fines when they complained about these rules and/or attempted to enjoy the complex's facilities.[3] On November 27-29, 2017, the Court held a bench trial on the following claims: 1) racial discrimination under the FHA and ALFHL, 2) familial-status discrimination under the FHA and ALFHL, 3) retaliation under the FHA and ALFHL, and 4) breach of covenant of quiet enjoyment under Alabama common law. The parties provided post-trial briefs, and the Court is prepared to rule.

## II. FINDINGS OF FACT

### A. *Stipulated Facts*

1. Defendant, The Grand Reserve MGM, LLC, is a Limited Liability Company doing business as "The Grand Reserve Pike Road."

2. Defendant Grand Reserve is a 376-unit upscale apartment complex located in Pike Road, Alabama.

3. Defendant is engaged in the business of renting units at The Grand Reserve Pike Road to members of the public.

4. Plaintiffs became tenants of the Grand Reserve apartments in August 2014.

5. Plaintiffs renewed their lease for another year on or about August 2, 2015.

---

[3]The Court provided lengthy discussions of the background of this case in its earlier opinions. *See Belcher v. Grand Reserve MGM, LLC*, 269 F. Supp. 3d 1219 (M.D. Ala. 2017); Order, *Belcher v. Grand Reserve MGM, LLC*, No. 2:15-CV-834-KS-TFM (M.D. Ala. Oct. 26, 2017), ECF No. 120.

### B. *The Court's Findings of Fact*

1. The Grand Reserve offers the following amenities: multiple playgrounds, two swimming pools, a fitness center/gym, a sauna, a pond, a gated entrance, tanning beds, laundry facilities, picnic tables, grills, and a clubhouse.

2. Apartments at the Grand Reserve were occupied by families and single persons of different races.

3. Families moved into the Grand Reserve so that their children could attend the Pike Road school district.

4. Plaintiffs moved into the Grand Reserve because they liked the amenities offered, and because the apartments were spacious.

5. Every Grand Reserve tenant's lease contained the following provision: "The Lessee agrees to comply with and to cause Lessee's guests and family members to comply with the rules and regulations for the apartment complex . . . ; and the Lessee agrees that the rules and regulations may be amended from time to time by the Lessor, and notice of such amendments of rules and regulations shall be sufficiently given by . . . personal delivery or posting a copy thereof on the door of the leased premises. IT IS AGREED THAT THE VIOLATION OF ANY SUCH RULES AND REGULATIONS BY THE LESSEE OR ANY OF THE LESSEE'S GUESTS OR FAMILY MEMBERS SHALL CONSTITUTE A DEFAULT IN THE TERMS OF THIS LEASE."

6. The lease also provided: "No lessee shall make, or permit to be made by his family members or guest(s), any disturbing noises or interfere in any way with rights of other residents of the operation of the property by the Lessor or his agents."

7. The lease also provided: "No children under the age of sixteen (16) may use the fitness equipment." The gym equipment also had visible manufacturers' warnings against use by children.

8. The lease provided: "No children under the age of (16) years will be allowed in or about the swimming pool area unless accompanied by an adult . . . ." The purpose of this rule was to promote safety, as there were no lifeguards on duty.

9. All Grand Reserve tenants and guests were required to wear a wristband when using the pools. The purpose of this rule was to limit use of the pool to tenants and their guests. Children from a neighborhood near the Grand Reserve would come in large numbers to use the Grand Reserve's pools.

10. The lease also provided: "Should the Lessee, his family or guest(s) fail to maintain a standard of behavior consistent with the consideration necessary to provide reasonable peace and quiet to other tenants, as determined solely by Lessor, such as by being boisterous or disorderly, acting in an offensive manner and/or using offensive language toward the Lessor, Lessor's agents and employees or potential lessess, creating undue noise, disturbance, or nuisance of any nature or kind, then Lessee shall be in default of this Lease."

11. At the time relevant to this case, Brittany Allen, an African-American woman, was the property manager at the Grand Reserve. She lived in the same building as Plaintiffs.

12. In late spring to early summer of 2015, Allen began receiving complaints from residents about the behavior of children in the apartment complex. Specifically, residents complained that:

    a. Used condoms and marijuana were found on the playground.

    b. Girls' underwear was found in the sauna.

    c. A yoga ball had been stuck under the belt on a treadmill in the gym, rendering the machine useless. Children had also been "running sideways" on the treadmills and throwing dumbbells.

    d. Children would throw balls and/or other toys and hit residents' vehicles.

    e. Older children were gambling/throwing dice in the breezeways of the apartment buildings.

    f. Children used profanity, including the "n-word," in the public areas of the apartment complex, such as the playgrounds.

g. Children turned the pool furniture upside down and threw it into the pool.

h. Children were pushing and hitting one another at the bus stop. On at least one occasion, one child pushed another into the road.

i. Children were sitting on residents' cars.

j. Children were smoking marijuana in the breezeways.

k. Children were running out in front of cars. On one occasion, a child rode a bicycle out into the parking lot and got hit by a car.

l. Children were littering.

m. Children were running up and down stairs, screaming and banging on apartment doors.

n. On one occasion, children shot a BB gun at an apartment window.

13. Many residents of different races complained about the behavior of children around the apartment complex, and the misbehaving children were of all races.

14. One resident complained that there were a lot of African-American kids smoking marijuana in the breezeway by his apartment.

15. Later, after the events giving rise to this case, a child was shot on the Grand Reserve property. There have been at least three shootings on the Grand Reserve property.

16. In reaction to many complaints about the children in the complex, Allen instituted some new rules and/or modified existing rules.

17. First, Allen promulgated an "Adult Supervision" rule, which required that "[c]hildren 17 and under . . . be supervised by an adult older than 19 years of age . . . when out on the property; excluding traveling to and from the school bus area."

18. Next, Allen established a "Curfew" rule, which required that "[a]ll children under 18 years of age unless unaccompanied by an adult must be inside of their apartment no later than 8:30 pm CST."

19. Allen also instituted a "Playground Rule," which provided that "[t]he use of the playground is only for elementary children, grades K-6. It is not a spot to hangout or loiter."

20. Allen also promulgated a "Pool Rule," which modified the existing rules regarding pool use. It provided that "children under 19 years of age cannot be at the pool without the accompaniment of an adult," and that "everyone in the apartment home must wear a wristband at the pool."

21. Finally, Allen instituted a "Gym Rule," which provided that the "Gym/Sauna is off limits to anyone below the age of 19. The Gym is not a place to hangout. Any resident in the facility below the proper age will be subject to a minimum $200 fine."

22. The new rules were rarely, if ever, enforced by the Grand Reserve or its agents and employees. No resident was ever fined or otherwise penalized for violating the new rules.

23. Courtesy officers – local law enforcement officers who patrolled the apartment complex – never issued fines. The officers also declined to enforce the new rules. Courtesy officers did, however, enforce rules contained in the lease agreement.

24. Children generally continued to use the amenities of the apartment complex as they had always done.

25. Allen instituted the new rules because she wanted to maintain a safe, family-friendly atmosphere in the apartment complex. She had no intention or desire to discriminate against residents with families or children, or on the basis of race. Likewise, she did not institute the rules in response to racially discriminatory complaints from residents or the property's owner. Her sole motivation was to promote the safety of the children living in the apartment complex and to ensure that all residents could enjoy the amenities without encountering obscene language, vandalism, sexually explicit behavior, illegal drug use, or the other problems that had plagued the community.

26. In May 2015, Brittany Allen notified Plaintiffs of a lease violation. Specifically, she had received complaints from other residents (African-American residents) about loud noises, yelling, and cursing related to a domestic dispute Plaintiffs were having. Other residents called the police, who responded and came to Plaintiffs' apartment. Although Allen issued a notice of lease violation and assessed Plaintiffs a $200 penalty, they never paid a fine or penalty for the noise violation.

27. Brittany Allen was eventually demoted to leasing consultant because of her difficulty in fulfilling the responsibilities of property manager. For example, auditing revealed that the Grand Reserve's rental income was substantially lower than it should have been. Savannah Cox was named the acting manager around September 15, 2015.

28. When Cox became the acting manager and learned of the new rules, she immediately rescinded them and instructed the apartment complex's staff that the new rules were not to be enforced.

29. After Cox became acting manager, she began reviewing the Grand Reserve's accounts and leases. She found that Khelsi Harvest – an African-American woman who was first a leasing consultant, and then the assistant property manager under Brittany Allen – had been leasing units below market rate. Cox immediately fired Harvest.

30. While Harvest was the assistant property manager under Brittany Allen, she asked about leasing the apartment complex's model apartment to a man named Murdock so that he could claim residency in the school district. Allen instructed Harvest to not lease the model apartment, but Harvest did it anyway and forged Allen's signature on the application and leasing documents. Murdock never actually lived in the model apartment. After Allen was demoted, management discovered that Harvest had leased the apartment without authorization.

31. Leasing consultants, such as Khelsi Harvest, get a $50 bonus for every unit they lease. They also get a 50% discount on their rent.

32. In October 2003, Khelsi Harvest pleaded guilty to one count of bank theft under 18 U.S.C. § 2113(b). Plea Agreement at 1, *United*

*States v. Harvest*, No. 2:03-CR-123-MHT (M.D. Ala. Oct. 6, 2003), ECF No. 19. According to the Plea Agreement, Harvest took and carried away $19,520.00 that was in the care, custody, and control of a federally insured bank, and that she acted with the intent to steal the funds from the bank. *Id.* at 1-2. The Court sentenced Harvest to five years of probation and ordered her to pay $16,946.39 in restitution. Judgment at 2, *United States v. Harvest*, No. 2:03-CR-123-MHT (M.D. Ala. Jan. 23, 2004), ECF No. 28.[4]

33. In April 2017, several months before this case went to trial, Khelsi Harvest filed her own lawsuit against the Grand Reserve, alleging that it fired her because of her race and to "prevent her from providing any support to" Plaintiffs. Complaint at 4, *Harvest v. The Grand Reserve MGM LLC*, No. 2:17-CV-209-WKW-WC (M.D. Ala. Apr. 10, 2017), ECF No. 1.

34. The Grand Reserve never collected any fine or penalty from Plaintiffs other than those related to late payment of rent. During their tenancy, Plaintiffs were charged 29 late payment fees and 3 penalties for insufficient funds.

35. During the summer of 2015 – when the disputed rules were in place – Plaintiffs' lease term expired, and they could have terminated the lease without penalty. Instead, Plaintiffs re-upped the lease, just a few months before filing this lawsuit.

36. Plaintiffs stopped paying their rent after they filed this lawsuit. After the Magistrate Judge instructed them that they still had to pay rent, they asked the Grand Reserve to release them from their lease with several months remaining on its term. Savannah Cox authorized waiver of the lease's early termination fee, but at the time of trial Plaintiffs still owed the Grand Reserve unpaid rent.

37. Three days before Plaintiffs filed this lawsuit, they remitted a money order to the Grand Reserve in the amount of $200.00. The money order was made payable to the Grand Reserve, but in the signature space for the payor someone had written "FINE FOR CHILDREN OUTSIDE" in a different color ink than the other writing on the money order. According to Savannah Cox, the

---

[4]Plaintiff objected to the Court's consideration of Harvest's prior conviction. The Court addresses this issue below.

Grand Reserve applied the money order to Plaintiffs' unpaid rent.

### III. CONCLUSIONS OF LAW

*A.     Racial Discrimination (FHA & ALFHL)*

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Likewise, the ALFHL makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with it, because of race . . . ." ALA. CODE § 24-8-4(1). Although the Eleventh Circuit has not addressed a claim of racial discrimination under the ALFHL, it has held that the "same legal analysis" applies to claims under the FHA and the Florida Fair Housing Act because the two laws are "substantively identical." *Phillipeaux v. Apt. Inv. & Mgmt. Co.*, 598 F. App'x 640, 643 (11th Cir. 2015). Therefore, as the relevant provisions of the FHA and ALFHL are substantively identical, the Court will apply the same legal analysis to Plaintiffs' claims under each law.

"To prove intentional discrimination, a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA." *Bonasera v. City of Norcross*, 342 F. App'x 581, 584 (11th Cir. 2009). "[A] plaintiff may meet this burden by presenting evidence that the 'decision-making body acted for the sole purpose of effectuating the desires of private citizens, that racial considerations were a motivating factor behind

those desires, and that members of the decision-making body were aware of the motivations of the private citizens.'" *Id.* (quoting *Hallmark Devs., Inc. v. Fulton County, Georgia*, 466 F.3d 1276, 1284 (11th Cir. 2006)).

Plaintiffs presented no credible evidence of racial discrimination. They presented no credible evidence that Brittany Allen – an African-American woman – was motivated by a desire to discriminate against the African-American residents of the apartment complex. Likewise, they presented no credible evidence that Allen promulgated the rules to placate white residents who were motivated by racial considerations. The only evidence presented to support Plaintiffs' claim of racial discrimination was testimony from Plaintiffs and Khelsi Harvest. Harvest testified that Brittany Allen said white tenants were complaining about the African-American tenants, and Plaintiffs testified that rules were only enforced against the African-American children. As the Court will explain, neither Plaintiffs' nor Harvest's testimony is credible.

With respect to Harvest, Brittany Allen and Savannah Cox testified that Harvest rented units below market rates without authorization, and it is undisputed that leasing consultants received a $50.00 bonus for every unit they leased. Therefore, the evidence shows that Harvest inflated her own sales figures at her employer's expense, receiving a $50 bonus every time she leased a unit below market rate. Moreover, Harvest forged Allen's signature on a lease application, using the Grand Reserve's model apartment to help someone defraud the local school district. Finally, Harvest had a pecuniary motive to testify against the Grand Reserve: she had filed her

10

own lawsuit against it for employment discrimination. All of this evidence is sufficient to cast considerable doubt on her credibility.

Additionally, Harvest has a prior conviction for a crime involving a dishonest act. Rule 609 provides that a witness's character for truthfulness may be impeached by evidence of a criminal conviction "for any crime regardless of the punishment, . . . if the court can readily determine that establishing the elements of the crime required proving – or the witness's admitting – a dishonest act or false statement." FED. R. EVID. 609(a)(2). However, "if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later," the evidence of conviction is only admissible if "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." FED. R. EVID. 609(b).

This rule "creates a strong presumption against the use for impeachment purposes" of prior convictions, such as this one, which are more than ten years old. *United States v. Pope*, 132 F.3d 684, 687 (11th Cir. 1998). Evidence of stale convictions "will be admitted very rarely and only in exceptional circumstances. In evaluating whether exceptional circumstances exist, the trial judge must consider whether the witness has already been impeached, and if so, the probative value of the prior conviction decreases accordingly." *United States v. Tisdale*, 817 F.2d 1552, 1555 (11th Cir. 1987).

Harvest's prior conviction for bank theft involves a dishonest act: she pleaded

11

guilty to embezzling $19,520.00 from a bank. In the Court's opinion, this is probative of her character for truthfulness here. Harvest's testimony is being used to extract an award of money damages from her former employer, against whom she filed her own lawsuit for alleged racial discrimination. The record contains substantial evidence that Harvest did not deal honestly with the Grand Reserve. She leased apartments below market rate so that she could collect more bonuses. She also forged her supervisor's signature on an application to assist someone in defrauding the local school district. In summary, her actions while employed by the Grand Reserve were characterized by dishonesty and self-dealing, and a judgment against the Grand Reserve in this case would bolster her claims of employment discrimination. These factors are similar in kind to her earlier conviction for embezzlement.

"The danger in admitting stale convictions is that while their remoteness limits their probative value, their prejudicial effect remains," and "the jury, despite limiting instructions, can hardly avoid drawing the inference that the past conviction suggests some probability that defendant committed [a] similar offense . . . ." *United States v. Pritchard*, 973 F.2d 905, 908 (11th Cir. 1992). This danger does not exist here because this is a bench trial. The Court can assign a fair amount of probative value to the prior conviction, in light of both the time that has passed and the substantial similarities to the present case. Even if the Court did not consider the prior conviction, it still would not find Harvest to be a credible witness because of the other substantial impeachment evidence in the record.

As for the Plaintiffs, the Court likewise does not find their testimony to be

credible. On multiple occasions during trial, the Court had to instruct Mrs. Belcher to stop coaching her children while they testified. To be clear: the Court witnessed Mrs. Belcher coaching all three minor plaintiffs during their testimony. Additionally, the minor Plaintiffs' testimony was inconsistent with their deposition testimony on many issues.

Although Plaintiffs claimed that they were fined for violations of the disputed rules, Defendants demonstrated that Plaintiffs were never fined for breaking the new rules instituted by Brittany Allen. Plaintiffs' only documentary evidence of being fined was a money order they remitted just days before filing this lawsuit, and upon which they wrote "FINED FOR CHILDREN OUTSIDE." Mrs. Belcher testified that Plaintiffs were late on their rent no more than twice during their period of residence at the Grand Reserve, but Defendants' accounting records demonstrate that Plaintiffs were charged late fees 29 times. Of course, neither Mr. Belcher nor Mrs. Belcher could provide conclusive answers on these matters because each claimed that the other handled the family's finances.

Defendants offered testimony from Brittany Allen, Savannah Cox, Allen Tucker, and Cedric Leonard that the disputed rules were not enforced. Cedric Leonard testified that children of all races were causing the problems that the new rules were intended to address, and that residents of all races complained about the children. Brittany Allen, an African-American woman, testified that she promulgated the new rules in a sincere effort to address serious problems caused by children in the apartment complex, and that race was not a motivating factor in her decision. Sheena Allen

13

denied having ever witnessed any discriminatory actions against residents at the Grand Reserve.

In summary, the Court finds that Plaintiffs presented no credible evidence that Defendants intended to discriminate against African-American residents, or that Defendants instituted the disputed rules in response to the racially discriminatory complaints of white residents.

B.      *Familial-Status Discrimination (FHA & ALFHL)*

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . familial status . . . ." 42 U.S.C. § 3604(b).[5] "'Familial status' means one or more individuals (who have not attained the age of 18 years) being domiciled with . . . a parent or another person having legal custody of such individual or individuals . . . ." 42 U.S.C. § 3602(k). Therefore, the FHA "prohibits discrimination against families with children." *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Comm. Homeowners Ass'n, Inc.*, 682 F. App'x 768, 770 (11th Cir. 2017) (citing 42 U.S.C. §§ 3604, 3602(k)). "To prove familial-status discrimination, [Plaintiffs] must show that Defendants discriminated against [them] in the terms, conditions, or privileges of . . . rental of a dwelling . . . because of familial

---

[5]Likewise, the ALFHL makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with it, because of . . . familial status . . . ." ALA. CODE § 24-8-4(1). Therefore, as the relevant provisions of the FHA and ALFHL are substantively identical, the Court will apply the same legal analysis to Plaintiffs' claims under each law. *Phillipeaux*, 598 F. App'x at 643.

14

status." *Woodard v. Fanboy, LLC*, 298 F.3d 1261, 1264 (11th Cir. 2002). If the disputed rule is not facially discriminatory, a plaintiff must demonstrate that "defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA," *Bonasera*, 342 F. App'x at 584.

But a plaintiff can also establish a *prima facie* violation of § 3604(b) by "establishing the existence of facially discriminatory rules which treat children, and thus, families with children, differently and less favorably than adults-only households." *Iniestra v. Cliff Warren Invs., Inc.*, 886 F. Supp. 2d 1161, 1166 (C.D. Cal. 2012). "Facially discriminatory actions are just a type of intentional discrimination or disparate treatment." *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Park Partners Residential, LLC*, No. 16-80740, 2017 U.S. Dist. LEXIS 35546, at *9 (S.D. Fla. Mar. 10, 2017). "When a facial challenge is made, the motive of the drafters of the ordinance is irrelevant." *Id.* at *10. To determine whether a rule is facially discriminatory, the Court first must determine whether "an ordinance singles out protected individuals with regard to housing and applies different rules to them." *Id.* at *9 (citing *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 (9th Cir. 2007)); *see also Hamad v. Woodcrest Condo. Ass'n*, 328 F.3d 224, 231 (6th Cir. 2003) (policy prohibiting those with children from renting/owning second and third floor condos was facially discriminatory on the basis of familial status). Second, "the Court must determine whether the differential treatment is justified such that it is not a violation of the FHA." *Park Partners*, 2017 U.S. Dist. LEXIS 35546 at *10 (citing *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1350 (S.D. Fla. 2007)).

15

"The Eleventh Circuit has not addressed the standard a . . . defendant must meet to justify disparate treatment under the FHA." *Jeffrey O.*, 511 F. Supp. 2d at 1350. The Sixth, Ninth, and Tenth Circuits require a defendant to "show either: (1) that the restriction benefits the protected class, or (2) that it responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes." *Cmty. House, Inc. v. City of Boise*, 468 F.3d 1118, 1125 (9th Cir. 2006) (citing *Larkin v. Michigan Dep't of Social Servs.*, 89 F.3d 285, 290 (6th Cir. 1996); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503 (10th Cir. 1995)).

The Court finds that Brittany Allen promulgated the disputed rules in response to legitimate safety concerns raised by residents of the Grand Reserve apartment complex. Therefore, even if the new rules were facially discriminatory on the basis of familial status, they were justified. The evidence at trial revealed a host of problems caused by children running amok in the apartment complex. Residents found used condoms and marijuana on the playgrounds. Children were engaging in sexual activity on the premises, and residents found a little girl's underwear in the sauna. Children were destroying the gym equipment, vandalizing the property, and preventing other residents (including other children) from enjoying the amenities of the apartment complex. Brittany Allen – a mother herself – testified that she promulgated the new rules for the protection and safety of the complex's children, in response to legitimate complaints from residents. She did not do so for the purpose of discriminating against families or children. It is certainly arguable whether the rules were the wisest or most efficient means of addressing these issues, but there is no reason to question Allen's

sincerity and good intentions. Regardless, the evidence shows that the new rules were not enforced. For these reasons, the Court rejects Plaintiffs' claim of familial-status discrimination.

## D.     Retaliation (FHA & ALFHL)

It is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by" the FHA. 42 U.S.C. § 3617.[6] "To establish a prima facie case of retaliation, a plaintiff must show that (1) he engaged in a protected activity; (2) the defendant subjected him to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." *Philippeaux*, 598 F. App'x at 644. "A plaintiff engages in statutorily protected activity when he or she protests . . . conduct which is actually lawful, so long as he or she demonstrates a good faith, reasonable belief that the conduct engaged in was . . . unlawful." *Id.* at 644-45.

Plaintiffs have not directed the Court to any credible evidence that Defendants subjected them to adverse actions because of protected activity. Plaintiffs were never fined or penalized for violating any of the disputed rules. In fact, Plaintiffs' testimony on this issue was riddled with misrepresentations, as demonstrated by Defendants' accounting records. The only fines or penalties levied against Plaintiffs were for late

---

[6]Likewise, the ALFHL provides: "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the enjoyment of, [or] exercise of . . . any right granted under this chapter." ALA. CODE § 24-8-8. Therefore, as the relevant provisions of the FHA and ALFHL are substantively identical, the Court will apply the same legal analysis to Plaintiffs' claims under each law. *Phillipeaux*, 598 F. App'x at 643.

payment of rent, and for a noise violation arising from a domestic dispute at their apartment. Although Defendant charged Plaintiff a $200 fine for the noise violation, Plaintiffs never actually paid a fine as the funds were applied to the back rent they owed. Additionally, the Court does not find the minor Plaintiffs' testimony to be credible on issues related to enforcement of the disputed rules, in light of the coaching they received throughout the trial and the inconsistencies with their previous deposition testimony. For these reasons, the Court finds that Plaintiffs have not carried their burden of proof on this claim.

### E. *Breach of Covenant of Quiet Enjoyment*

"[T]here is implied in every leasing a covenant of quiet enjoyment." *Johnson v. Northpointe Apts.*, 744 So. 2d 899, 902 (Ala. 1999). "The landlord warrants that the tenant will not be disturbed in possession by any other person with a superior legal right to possession. Moreover, the landlord covenants not to evict the tenant himself, actually or constructively." *Id.* "A breach of the covenant of quiet enjoyment occurs when the landlord substantially interferes with the tenant's beneficial use or enjoyment of the premises. Even if not substantial enough to rise to the level of a constructive eviction . . . , such interference may constitute a breach of the covenant of quiet enjoyment entitling the tenant to damages." *Id.* Among other things, "the covenant of quiet enjoyment is breached by threats or other forms of intimidation before the expiration of the tenancy." *Horne v. TGM Assocs., LP*, 56 So. 3d 615, 627 (Ala. 2010) (citing *Johnson*, 744 So. 2d at 902). The question is whether Defendants' actions "materially affect[ed] the value and interfer[ed] with the present right to use

and to the possession of a part of the premises . . . ." *Wolff v. Woodruff*, 61 So. 2d 69, 73 (Ala. 1952). To constitute a constructive eviction, "it is necessary that the conduct of the landlord manifest an intention to deprive the tenant of possession of the rented premises. The intent need not be actual, but may be presumptive, or inferable from the character of the landlord's interference." *S. Security Servs., Inc. v. Esneault*, 435 So. 2d 1309, 1312 (Ala. Civ. App. 1983).

The Court finds that Plaintiffs have not demonstrated that Defendants substantially interfered with their enjoyment of the premises. Multiple witnesses testified that the disputed rules were not enforced. For the same reasons provided above, the Court does not find Plaintiffs' testimony to be credible with regard to enforcement of the rules. Plaintiffs' testimony as to the purported effect that the rules had on them is inconsistent. Although Plaintiffs claim that enforcement of the rules made their lives miserable, they re-upped their lease in the summer of 2015, when they could have left the Grand Reserve without penalty. Accordingly, the Court finds that Plaintiffs failed to carry their burden of proof on this claim.

## IV. CONCLUSION

For these reasons, the Court finds as follows: 1) Plaintiffs presented no credible evidence of racial discrimination, 2) Plaintiffs' claims of familial discrimination fail because Defendants were responding to legitimate safety concerns, 3) Defendants did not retaliate against Plaintiffs, and 4) Defendants did not substantially interfere with Plaintiffs' use or enjoyment of the subject property. The Court will enter a separate final judgment in favor of Defendants.

SO ORDERED AND ADJUDGED this __25th__ day of __September__, 2018.

                                                  s/Keith Starrett
                                        UNITED STATES DISTRICT JUDGE